IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

September 5, 2018 Session

## STATE OF TENNESSEE v. MICHAEL RIMMER

**Appeal from the Criminal Court for Shelby County**
**No. 98-01033, 98-01034     Chris Craft, Judge**

_____

### No. W2017-00504-CCA-R3-DD
_____

The Defendant, Michael Rimmer, was convicted by a Shelby County jury of first degree premeditated murder, first degree felony murder, and aggravated robbery. T.C.A. §39-13-202(1), (2) (Supp. 1998) (first degree murder), §39-13-402 (1997) (aggravated robbery). The trial court merged the felony murder conviction into the premeditated murder conviction. The jury sentenced the Defendant to death for the first degree murder conviction, and the trial court sentenced him to eighteen years for the aggravated robbery conviction and ordered it to be served consecutively to the sentence for the murder conviction. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions for first degree murder and aggravated robbery; (2) the trial court erred in denying his motion to dismiss the felony murder charge; (3) the trial court erred in denying his motion to suppress DNA evidence; (4) the trial court erred in not striking the State's opening statement or declaring a mistrial based on a comment made by the State; (5) the trial court erred in admitting evidence of the Defendant's prior convictions; (6) the trial court erred in limiting the testimony of William Baldwin; (7) the trial court erred in admitting a drawing of the backseat of the Honda the Defendant was driving when he was arrested; (8) the trial court erred in finding James Allard was unavailable and allowing his testimony from the previous trial to be entered into evidence; (9) the trial court erred in admitting hearsay testimony through witness Rhonda Bell; (10) the trial court erred in allowing Chris Ellsworth to display his scars to the jury; (11) the trial court erred in allowing hearsay testimony through witness Tim Helldorfer; (12) the trial court erred in limiting the testimony of Tim Helldorfer regarding a photograph identification and the release of the Honda from police custody; (13) the trial court erred in allowing Joyce Carmichael to testify about Tommy Voyles; (14) the trial court erred in admitting previous testimony of deceased or otherwise unavailable witnesses; (15) the trial court erred in admitting Richard Rimmer's prior statement and related exhibits as substantive evidence; (16) the trial court erred in limiting the testimony of Kenneth Falk; (17) the trial court erred in limiting the testimony of Marilyn Miller; (18) the trial court erred in excluding documents relating to a lawsuit involving the Shelby County Jail; and

(19) the trial court erred in applying an aggravating factor and imposing a consecutive sentence for the aggravated robbery conviction. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Paul Bruno, Nashville, Tennessee; and Robert Parris, Memphis, Tennessee, for the appellant, Michael Rimmer.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Andrew C. Coulam, Assistant Attorney General; Rachel M. Stephens and Pamela S. Anderson, District Attorneys General Pro Tem, for the appellee, State of Tennessee.

**OPINION**

PROCEDURAL BACKGROUND

On November 7, 1998, the Defendant, Michael Rimmer, was convicted by a Shelby County jury of first degree premeditated murder, first degree felony murder, aggravated robbery, and theft of property valued at $1,000 or more but less than $10,000. The jury imposed a sentence of death. On appeal, this court affirmed his convictions but reversed the sentence of death and remanded the case to the trial court for a new sentencing hearing. *See State v. Michael D. Rimmer*, No. W1999-00637-CCA-R3-DD, 2001 WL 567960, at *1 (Tenn. Crim. App. May 25, 2001).

At the conclusion of the January 2004 resentencing hearing, the jury again imposed a sentence of death. On appeal, this court affirmed. *See State v. Michael Dale Rimmer*, No. W2004-002240-CCA-R3-CD, 2006 WL 3731206, at *1 (Tenn. Crim. App. Aug. 13, 2007). The Tennessee Supreme Court, likewise, affirmed. *See State v. Rimmer*, 250 S.W.3d 12, 18 (Tenn. 2008).

Thereafter, the Defendant filed a petition for post-conviction relief alleging that he received the ineffective assistance of counsel. Following an evidentiary hearing, the post-conviction court granted relief. The court found that defense counsel's "overburdened case load caused both counsel and the auxiliary members of the defense team to conduct a seriously deficient investigation of petitioner's case." In particular,

counsel did not discover that a witness identified a man other than the Defendant as the person he saw at the scene of the crime. Although the court acknowledged that the State's evidence against the Defendant was strong, it found that the undiscovered evidence called into question the reliability of the jury's verdict. The post-conviction court concluded that the Defendant was entitled to a new trial. The State did not appeal. Prior to the retrial, the trial court severed the theft charge.

At the subsequent trial in April 2016, the evidence showed that the Defendant and the victim had an on-and-off relationship in the late 1970s and early 1980s. In 1989, the Defendant pleaded guilty to burglary in the first degree, aggravated assault, and rape of the victim. While serving his sentence, the Defendant threatened to kill the victim to fellow inmates Roger Lescure and William Conaley. Both inmates testified that the Defendant became very agitated when discussing the victim. The Defendant also discussed methods for disposing of a body.

The Defendant was released from prison in January 1997 and began working for an automobile repair shop. Through his work, he met Steve and Cheryl Featherston after the Defendant assisted in repairing a car at their home. Later that month, the Featherstons reported to the police that a 1998 maroon Honda Accord disappeared from their driveway. Mr. Featherston testified that at the time the car disappeared, it was very clean and did not have any upholstery stains.

During this time, the victim worked as a night clerk at a Memphis motel. She reported to work on the night of February 7, 1997, and guests at the motel established that she was present until approximately 1:45 a.m. on February 8. However, after that time, the victim disappeared from the office, and she had no further communication with anyone. Her body has never been found.

James Defevere checked into the motel between 1:00 and 1:15 a.m. on February 8. When guest Natalie Doonan went to the vending area adjacent to the front office between 1:30 and 1:45 a.m., she saw a man enter the lobby. The victim was behind the desk at this time. Dr. Ronald King was in the vending area around 1:40 a.m. and saw the victim allow a man into the office through the locked security door. Dr. King said the man drove a maroon car. Twenty to thirty minutes after Ms. Doonan left the vending area, she called the front desk but received no answer. Mr. Defevere returned to the office to check out around 2:25 a.m., but the victim was not in the office.

James Darnell and Dixie Presley stopped at the motel between 1:30 and 2:00 a.m. to pick up a map, parking a few spaces from the night entrance. Ms. Presley waited in the car while Mr. Darnell went inside. She saw a maroon car parked in front of the office entrance with its trunk open. She thought this was odd because there was light rain. Mr.

Darnell noticed a man standing next to the trunk of a maroon car, which had been backed into a parking spot with the trunk closest to the building. The man "had something rolled up in his arms," which the man placed in the trunk. Mr. Darnell said that the object was rolled up in a "blanket" and that the car sank when it was placed in the trunk.

Mr. Darnell proceeded to the motel entrance, and the man who had been standing by the car quickly walked to the entrance, as well. Mr. Darnell opened the door and allowed the man to enter first. Mr. Darnell noticed the man had blood on his hands. When Mr. Darnell entered the lobby, he saw that the office door was open and that a different man was at the desk, pushing money under the window. Although Mr. Darnell could not identify the man who was outside and followed him into the office, Mr. Darnell identified the man behind the window as Billy Wayne Voyles.

Raymond Summers, CSX Railroad yardmaster, testified that CSX housed its crews at the motel in February 1997. On February 7, Mr. Summers attempted to call the front desk between 2:45 and 3:00 a.m., but no one answered. He then drove to the motel, arriving approximately ten minutes later, and he found the night clerk's office abandoned. The secured door leading into the office was open, and Mr. Summers entered the office looking for a motel employee. He heard running water and followed the sound into the employee bathroom. In the bathroom, he saw blood on the sink basin and toilet and bloody towels on the floor, and the toilet seat was missing. He immediately left the motel in search of help. He encountered two Shelby County Sheriff deputies in a restaurant parking lot near the motel. The deputies immediately went to the motel, secured the scene, and called the Memphis Police Department (MPD).

MPD crime scene investigators found large amounts of blood, a cracked sink, bloody towels, and a broken toilet seat. A bloody trail led from the bathroom, through the office, and to the curb outside the motel's night entrance. The motel manager testified that approximately $600 was missing from the office as well as several sets of sheets. Approximately $400 was missing from the register drawer and another $200 was missing from a lockbox kept in a backroom. The victim kept a key in her pocket in order to access the lockbox. The victim's purse was in the office, her car was in the parking lot, and her wedding ring, which she always wore, was found on the bathroom floor.

Between 8:30 and 9:00 on the morning of February 8, the Defendant arrived at his brother's home in Mississippi. The Defendant drove a maroon Honda, and his shoes and the car were muddy. He claimed that he drove into a ditch. He carried a shovel to his brother and asked his brother to dispose of it. The Defendant also asked his brother to help him clean blood out of the backseat of the Honda. His brother allowed the Defendant to clean his shoes but declined the Defendant's request to stay at the home. After the Defendant left, his brother disposed of the shovel.

- 4 -

Although the Defendant had only worked at the repair shop for approximately three weeks, his supervisor described him as a reliable worker. However, on February 10, the Defendant failed to report to work, and he was not seen again until March 5, when he was stopped for speeding in Johnson County, Indiana. Authorities in Indiana discovered that the car the Defendant drove was the Featherstons' missing Honda and that the Defendant was wanted for questioning in connection with the victim's disappearance.

Receipts found in the car showed that the Defendant had traveled throughout the country since the victim's disappearance. He traveled through Mississippi, Florida, Missouri, Wyoming, Montana, California, Arizona, Texas, and Indiana. Investigators found large blood stains in the back seat of the car. A DNA sample collected from the victim's mother, Marjorie Floyd, was compared with forensic evidence found in the car and in the motel bathroom. DNA testing showed that the blood from the back seat was consistent with a daughter of Ms. Floyd and that blood from the motel bathroom and the car were consistent with the victim's DNA.

While incarcerated in Indiana, the Defendant told his cellmate, James Allard, Jr., that he killed his "wife" in the motel where she worked. According to Mr. Allard, the Defendant told him that "he went to [the victim's] place of business, . . . that she let him in there" and that he attacked her "in a back room behind the service desk or whatever in the office part." The Defendant told Mr. Allard that he shot the victim in the chest. The Defendant stated that he had been "doing something" in the back room, that the victim "got up," and that he shot her a second time in the head. The Defendant described the scene as bloody, said he had "dumped the body," and expressed surprise that the body had not been found.

Following his arrest, the Defendant participated in several escape attempts. The Defendant used toenail clippers to cut an opening in the recreation-yard fence. The Defendant discussed his plans with Mr. Allard, which included taking a guard hostage and killing a guard if necessary. Two "shanks," described as homemade knives, were located in the Defendant's Indiana cell. The Defendant attempted to escape again during his transport from Indiana to Tennessee. The Defendant obtained control of the van and led local law enforcement on a twenty-mile chase in Bowling Green, Ohio. Police stopped the van at a roadblock and apprehended the Defendant. After arriving at the Shelby County Jail, the Defendant and another inmate attempted to escape by sawing through the bars of their cell, breaking a window, and repelling down the building using a homemade rope.

Upon this evidence, the jury convicted the Defendant of first degree premeditated murder, first degree felony murder, and aggravated robbery. The trial court merged the felony murder conviction into the premeditated murder conviction. At the bifurcated sentencing hearing, the victim's mother's previous victim impact testimony was read to the jury. As an aggravating factor, the State introduced certified copies of the Defendant's four prior felony convictions involving the use of violence against a person. The Defendant chose not to present any mitigating evidence. The jury sentenced the Defendant to death.

ANALYSIS

## I. Sufficiency of the Evidence and Indictments

The Defendant contends that no evidence connected him to the crimes, but his argument focuses on whether the indictments provided him with adequate notice that other persons could have been involved in the crimes. The Defendant argues that the evidence showed that two other men committed the murder and that no evidence supports a theory of criminal responsibility. The State responds that ample evidence connected the Defendant to the murder and to the robbery and that "the fact that others might have been involved was not an element of the charged offenses." Further, the State argues that criminal responsibility is a theory of guilt and need not be stated in an indictment.

## A. Sufficiency of the Evidence

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-81.

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1).  In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death.  *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result").  A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).  The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing.  *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).  Proof of premeditation may be shown by direct or circumstantial evidence.  *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]"  T.C.A. § 39-13-202(a)(2) (2014).

Aggravated robbery is defined, in relevant part, as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," "where the victim suffers serious bodily injury."  *Id.* §§ 39-13-401(a) (2014), -402(a)(1).  Theft of property occurs when "with the intent to deprive the owner of property, [a] person knowingly obtains or exercises control over the property without the owner's effective consent."  T.C.A. § 39-14-103(a) (2014).

There was strong direct and circumstantial evidence establishing that the Defendant participated in the victim's murder and the aggravated robbery of the victim.  The Defendant discussed his plan to kill the victim and to hide her body when he was previously incarcerated for assaulting the victim.  Witnesses testified that a maroon car was seen at the motel, and the Defendant was seen with a maroon Honda the day after the victim's disappearance.  The Defendant was driving the maroon Honda at the time of his arrest, and the car contained blood and DNA consistent with that of the victim.  The

motel bathroom contained the victim's blood and DNA, and the victim was never seen after the early morning hours of February 8, 1997. Testimony established that $600 and several sets of bed sheets were missing from the motel office. Some of the missing money was from a lockbox kept in a back room, and the victim kept the key to the box on her person. The Defendant told another inmate that he had been in the back room "doing something" after he shot the victim in the chest, that she "got up," and he shot her in the head. One of the witnesses saw a man place an object rolled up in a blanket in the trunk of a maroon car that was backed into a parking place with its open trunk facing toward the building. The car sank when the object was placed in the trunk.

Witnesses and investigators described a bloody scene indicative of a violent struggle, supporting the conclusion that the victim suffered serious bodily injury. Witness testimony also established that two perpetrators participated in the offenses. Mr. Allard testified that the Defendant confessed to being present at the motel and to actively participating in the attack against the victim. Several hours after the victim disappeared, the Defendant arrived at his brother's home Mississippi in a maroon Honda, which was muddy. The Defendant's shoes were muddy, and he asked his brother to dispose of a shovel and to assist him in cleaning blood from the backseat of the car.

Following the victim's disappearance, the Defendant also disappeared for approximately one month. He stopped going to work and did not pick up his last paycheck, although his supervisor described the Defendant as reliable. Receipts found in the Honda showed that the Defendant had traveled throughout the country before his arrest in Indiana. After his arrest, he told Mr. Allard that he had murdered the victim and hid her body. The Defendant also attempted to escape from police custody on three occasions. We conclude that sufficient evidence supports the first degree premeditated murder, first degree felony murder, and aggravated robbery convictions.

## B. Sufficiency of the Indictments

An individual accused of a crime has the right to be informed of the nature and cause of an accusation against him. U.S. Const. amend. XI, XIV; Tenn. Const. art. 1, § 9. Pursuant to Tennessee Code Annotated section 40-13-202 (2012), an indictment

> must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . .

Our supreme court has said that an indictment is sufficient if it provides adequate information to enable the defendant to know the accusation against which he must defend, furnishes the trial court with an adequate basis for entry of a proper judgment, and protects the defendant from double jeopardy. *See State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *see also Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000). The supreme court has held that "indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). In this regard, "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000). The indictment "need not allege the specific theory or means by which the State intends to prove each element of an offense to achieve the overriding purpose of notice to the accused." *Hammonds*, 30 S.W.3d at 300. Thus, the State is not required to assert a theory of criminal responsibility in the charging instrument. *State v. Lemacks*, 996 S.W.2d 166, 172-73 (Tenn. 1999).

The indictments were not included in the appellate record, but they were read into evidence at the trial. The aggravated robbery indictment in No. 98-01033 read as follows:

> Count 1, The grand jurors of the State of Tennessee . . . present that [the Defendant], during the period of time between February 7th 1997, and February 8th, 1997, in Shelby County, Tennessee, and before the finding of this indictment, intentionally or knowingly did take from [the victim] a sum of money of value by violence or putting [the victim] in fear. And the victim . . . suffered serious bodily injury, in violation of Tennessee Code Annotated 39-13-402 . . . .

The murder indictment in No. 98-01034 stated:

> Count 1, The grand jurors of the [S]tate of Tennessee . . . present that [the Defendant] during the period of time between February 7th 1997, and February 8th, 1997, in [C]ounty of Shelby, Tennessee, and before the finding of this indictment did unlawfully, intentionally, and with premeditation kill [the victim] in violation of Tennessee Code Annotated 39-13-202 . . . .

> Count 2[,] The grand jurors of the State of Tennessee . . . present that [the Defendant], during the period of time between February 7th, 1997, and February 8th, 1997, in Shelby County, Tennessee, did unlawfully, with the intent to commit robbery, kill [the victim] during the perpetration of or

attempt to perpetrate robbery, in violation of Tennessee Code Annotated 39-13-202 . . . .

The elements of aggravated robbery, premeditated murder, and felony murder were clearly set forth in the indictment, along with the statutes for each. The Defendant contends that the State's rebuttal closing argument included statements that other persons were involved in the crimes and that these assertions "surprised" him. However, the State is not required to set forth its theory of guilt in the indictment. The State's argument was based on the proof submitted at trial, including witness testimony that more than one person was participated in the crimes at the motel on the night the victim disappeared. The Defendant is not entitled to relief on this basis.

## II. Double Jeopardy

The Defendant asserts that the trial court erred in denying his motion to dismiss Count 2 of the indictment charging him with felony murder. He argues that the felony murder charge violated double jeopardy principles because a verdict was not returned on that count in his first trial. The State responds that the failure to return a verdict was not an implicit acquittal because the court had instructed the jury not to consider felony murder if it found the Defendant guilty of first degree premeditated murder.

The double jeopardy clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." Article 1, Section 10 of the Tennessee Constitution provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb." The clause has been interpreted to offer the following protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *see State v. Phillips*, 924 S.W.2d 662, 664 (Tenn. 1996). The principle applies in cases in which "no final determination of guilt or innocence has been made" and in which a jury has been given the opportunity to return a verdict on a charge in one trial but failed to do so, impliedly acquitting the defendant of that charge. *United States v. Scott*, 437 U.S. 82, 92 (1978); *Price v. Georgia*, 398 U.S. 323, 329 (1970).

During the Defendant's November 1998 trial, the trial court instructed the jury in pertinent part:

Indictment number 98-01034 charges the defendant with the offense of MURDER IN THE FIRST DEGREE. This indictment is in two (2) counts.

The First Count of indictment number 98-01034 charge that the defendant did unlawfully, intentionally and with premeditation kill RICCI LYNN ELLSWORTH. This offense embarces and includes the lesser offenses of MURDER IN THE SECOND DEGREE, and VOLUNTARY MANSLAUGHTER.

The Second Count of indictment number 98-01034 charges that the defendant did unlawfully, and with the intent to commit robbery, kill RICCI LYNN ELLSWORTH during the perpetration of ROBBERY.

Indictment number 98-01033 charges the defendant with the offense of AGGRAVATED ROBBERY. This offense embraces and includes the lesser offenses of ROBBERY and THEFT OF PROPERTY OVER $500.

Indictment number 97-02819 is in two (2) counts. Both counts charge the defendant with the offense of THEFT OF PROPERTY.

These three indictments have been consolidated for trial at one time, but it must be remembered at all times that even though the indictments are being tried together, they are separate and distinct cases and must be treated by the Jury as such.

. . . .

You may convict the defendant on all indictments, or acquit him on all indictments; or convict on one and acquit on the others. If you find from the evidence, beyond a reasonable doubt, the defendant guilty [sic] of each indictment, you should convict on each. If you find from the evidence, beyond a reasonable doubt, one indictment guilty [sic] and have a reasonable doubt as to the guilt of the other indictments, you should convict on the one you are satisfied beyond a reasonable doubt of, and acquit on all the others. If you have a reasonable doubt as to the guilt on all, you should acquit on all.

As to the Theft indictment only, 97-02817, you may convict the defendant on both counts; or convict on one and acquit on the other. If you find from the evidence, beyond a reasonable doubt, the defendant of both

counts guilty [sic], you should convict on both.  If you find from the evidence, beyond a reasonable doubt, one count guilty [sic], and have a reasonable doubt as to the guilt of the other count, you should convict on the one you are satisfied beyond a reasonable doubt as to the guilt of, and acquit on the other.  If you have a reasonable doubt as to the guilt on both, you should acquit on both.

. . . .

When you retire to consider your verdict in indictment number 98-01034, you will first inquire, is the defendant guilty of Murder in the First Degree as charged in the First Count of the indictment?  If you find the defendant guilty of this offense, beyond a reasonable doubt, your verdict should be,

"We the Jury, find the defendant guilty of Murder in the First Degree as charged in the First Count of the Indictment."

If you find the defendant not guilty of this offense, or if you have a reasonable doubt of his guilt of this offense, you will acquit him thereof and then proceed to inquire whether or not he is guilty of Murder in the First Degree During the Perpetration of a Robbery as charged in the Second Count of the indictment.

If you find, beyond a reasonable doubt, that the defendant is guilty of this offense, your verdict should be,

"We the Jury, find the defendant guilty of Murder in the First Degree During the Perpetration of a Robbery as charged in the Second Count of the indictment."

If you find the defendant not guilty of this offense, or if you have a reasonable doubt of his guilt of this offense, you will acquit him thereof and then proceed to inquire whether or not he is guilty of Murder in the Second Degree as included in the First Count of the Indictment.

If you find, beyond a reasonable doubt, that the defendant is guilty of this offense, your verdict should be,

"We, the Jury, find the defendant guilty of Murder in the Second Degree as included in the First Count of the Indictment."

- 12 -

If you find the defendant not guilty of this offense, or if you have a reasonable doubt of his guilt of this offense, you will acquit him thereof and then proceed to inquire whether or not he is guilty of Voluntary Manslaughter as included in the First Count of the indictment.

If you find, beyond a reasonable doubt, that the defendant is guilty of this offense, your verdict should be,

"We, the Jury, find the defendant guilty of Voluntary Manslaughter as included in the First Count of the Indictment."

If you do find the defendant guilty, you can convict him of only one of the above named offenses charged and included in this indictment . . . .

Next, the trial court instructed the jury as to the single count of aggravated robbery charged in indictment 98-01034 and as to the two counts of theft charged in indictment 97-02817.

The jury convicted the Defendant of first degree premeditated murder and returned the verdict for Count 1 without returning a verdict for felony murder in Count 2, as instructed by the court. The jury also returned guilty verdicts for aggravated robbery and theft. *See State v. Michael Dale Rimmer*, No. W2004-02240-CCA-R3-DD, 2006 WL 3731206, slip op. at 1 (Tenn. Crim. App. Dec. 15, 2006), *aff'd*, 205 S.W.3d 12.

This type of jury instruction, in which the jury is told to consider a lesser included offense only when it acquits of the greater offense, has been referred to as a "sequential" or "acquittal first" instruction. *See Harris v. State*, 947 S.W.2d 156, 175-76 (Tenn. Crim. App. 1996). Our supreme court has upheld the validity of such instructions, while also cautioning that their use could potentially give rise to a double jeopardy problem. *State v. Howard*, 30 S.W.3d 271, 274 n.4 (Tenn. 2000) ("While it was not error for the trial court to deliver sequential jury instructions, we have previously urged trial courts to allow juries to consider all theories of first-degree murder.") (internal citations omitted). Despite this potential problem, both this court and the supreme court have allowed new trials of charges for which no verdicts were reached and in which sequential instructions were given. *See State v. Madkins*, 989 S.W.2d 697, 699 (Tenn. 1999); *State v. Burns*, 979 S.W.2d 276, 291 (Tenn. 1998); *State v. John E. Parnell*, No. W1999-00562-CCA-R3-CD, 2001 WL 124526, at *6 (Tenn. Crim. App. Feb. 6, 2001); *State v. David William Smith*, No. 03C01-9809-CR-00344, 2000 WL 210378, at *6 (Tenn. Crim. App. Feb. 24, 2000).

This court previously ordered a new trial under circumstances almost identical to those in this case. In *State v. Antonio Saulsberry*, the defendant was indicted for one count of premeditated murder, two counts of felony murder, and one count each of especially aggravated robbery and conspiracy to commit a felony. No. 2005-00316-CCA-R9-CD, 2006 WL 2596771, at *2 (Tenn. Crim. App. Sept. 11, 2006), *perm. app. denied* (Tenn. Jan. 29, 2007). He was convicted of first degree premeditated murder, especially aggravated robbery, and conspiracy to commit aggravated robbery. His conviction for premeditated murder was reversed on appeal, and his remaining convictions were affirmed. Thereafter, the State sought a new trial on the two counts of felony murder. The defendant filed a motion to dismiss the indictment, arguing that the new trial violated principles of double jeopardy. *Id.* at *1-3. This court concluded that double jeopardy principles did not preclude a subsequent trial of the felony murder charges. *Id.* at *5. The court noted that the sequential jury instructions, as provided in this case, led to a presumption that the jury never considered the felony murder charges after reaching a guilty verdict on premeditated murder. *Id.*

The jury at the Defendant's first trial was instructed to consider the felony murder charge only if it returned a not guilty verdict for premeditated murder. A jury is presumed to follow the trial court's instructions. *Nesbit v. State*, 452 S.W.3d 779, 799 (Tenn. 2014). We conclude that in this case the lack of a jury verdict on the felony murder count at the first trial was not an implicit acquittal and that double jeopardy principles were not violated at the second trial. The Defendant is not entitled to relief on this basis.

### III. Motion to Suppress DNA Evidence

The Defendant contends that the trial court erred in denying his motion to suppress DNA evidence. He asserts that the State destroyed the maroon Honda without affording the defense an opportunity to inspect it. The State avers that consideration of this issue is barred by the doctrine of collateral estoppel because it was previously determined by the post-conviction court. Alternatively, the State asserts that the issue is without merit because it was not obligated to preserve an entire automobile indefinitely when the State had documented the car and its contents and preserved evidence obtained from it.

#### A. Collateral Estoppel

In his petition for post-conviction relief, the Defendant contended that the State's failure to preserve the Honda for inspection by the defense violated his right to due process under the law. The post-conviction court rejected this argument, concluding that the State did not have a duty to preserve the car.

The doctrine of collateral estoppel has been applied infrequently in criminal cases. *See State v. David Scarbrough*, No. E2003-02850-CCA-R9-CD, 2004 WL 2280423, at *8 (Tenn. Crim. App. Oct. 11, 2004) (noting that, at the time, no Tennessee appellate court had considered the issue of offensive collateral estoppel in criminal cases). Our supreme court has acknowledged that the doctrine's application may be appropriate in some criminal cases. *See State v. Flake*, 114 S.W.3d 487, 507 (Tenn. 2003) (choosing to address a suppression issue on the merits even though the State argued collateral estoppel applied because a court had previously rejected the issue in a petition to rehear). We address this issue on the merits and decline to apply the doctrine of collateral estoppel.

**B. Due Process Violation**

The Defendant filed a motion to suppress DNA evidence gathered from the maroon Honda, arguing that the State's failure to preserve the car deprived the defense of its ability to perform its own testing and violated his right to due process. The Defendant asserts he was prejudiced in two ways: (1) he was unable to inspect the back seat upon which blood was located, noting "a continuing dispute as to the amount of blood" on the back seat and (2) he was unable to inspect the trunk to determine whether any blood was inside, noting that a witness testified that someone placed a large object rolled up in a "sheet" into the trunk, causing the trunk to sink. The Defendant argues that the testimony implied the victim's body was placed in the trunk and that, based on the amount of blood found in the bathroom, the trunk likely contained blood evidence. At the pretrial hearing, the trial court repeatedly pressed the Defendant to explain what benefit the defense could have derived from the destroyed evidence. The Defendant argued it would have been exculpatory if the trunk did not contain blood.

The trial court determined that the State had no duty to preserve the Honda. The court concluded that the Defendant could receive a fundamentally fair trial without having the car for inspection. The court noted that even if no blood were found in the trunk, or someone else's blood were found there, it would not exculpate the Defendant given the other evidence in the car connecting him to the victim's disappearance.

At the trial, Linda Littlejohn testified that she was employed by the Tennessee Bureau of Investigation (TBI), and that in 1997, she worked as a forensic scientist in the microanalysis unit processing trace evidence. She processed the maroon Honda, which included taking photographs, obtaining an inventory of the car's contents, and vacuuming the car to capture hair and fibers. She also removed portions of the carpet and cloth seats. After the car was processed, it was released by the police department.

- 15 -

TBI forensic scientist Samera Zavaro testified that she conducted serological analysis on evidence obtained from the crime scene and the maroon Honda. She collected samples from the car that appeared to be blood, which included taking swabs of hard surfaces and cuttings from fabric. She did not take samples from the trunk.

Our supreme court has "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912 915-16 (Tenn. 1999)). The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *Merriman*, 410 S.W.3d at 784-85; s*ee Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Merriman*, 410 S.W.3d at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court stated that the trial court must first "determine whether the State had a duty to preserve the evidence," observing that the State's duty to preserve was "limited to constitutionally material evidence." *Id.* at 785. The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Id.* (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must consider three factors to determine the appropriate remedy for the State's failure: "'(1)[t]he degree of negligence involved; (2)[t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3)[t]he sufficiency of the other evidence used at trial to support the conviction.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 785-86.

This court reviews a trial court's decision concerning the fundamental fairness of a trial conducted without the destroyed evidence under a de novo standard of review. *Id.* at 791. If this court concludes that the trial would be fundamentally unfair in the absence of the lost evidence, this court will apply an abuse of discretion standard to review the appropriateness of the remedy imposed by the trial court. *Id.* at 792.

Our analysis begins by considering whether the State had a duty to preserve the car. The duty to preserve arises only when the evidence is constitutionally material. The Defendant contends that the evidence is material because a lack of blood in the trunk would have undermined witness testimony implying that the victim's body was placed in the trunk. He asserts that this would have allowed him to argue that the maroon Honda he drove was not the same car seen at the motel and, by implication, used in the crimes. However, the Defendant has not articulated how evidence from the trunk would have been exculpatory. As the trial court noted, a lack of blood in the trunk would not have negated the evidence that a large blood stain, which matched the victim's DNA, was found in the backseat of the car. We conclude that any evidence that no blood was found in the trunk would not have been exculpatory. Consequently, the State did not have a duty to preserve the car because the trunk evidence was not constitutionally material.

The Defendant further contends that the trial court erred in refusing to provide a jury instruction relative to the State's release of the car. However, a jury instruction is a remedy to be employed only after the court determines that the State had a duty to preserve evidence. Because the court did not err in finding that the State did not have a duty to preserve the car, a jury instruction was not required. The Defendant is not entitled to relief on this issue.

## IV. State's Opening Statement

The Defendant next asserts that the trial court erred in not striking the State's opening statement or in not declaring a mistrial when the prosecutor said that the car had been "taken." The Defendant argues that the State's reference to the car implied it had been stolen, which violated the court's pretrial order prohibiting the State from referring to the car as stolen, pursuant to Tennessee Rule of Evidence 404(b), and due process. The State disagrees, arguing that reference to the car as "taken" did not violate the court's pretrial ruling, that Rule 404(b) does not apply to opening statements, and that any due process violation was by failing to object at the trial and in the motion for new trial.

In addition to the aggravated robbery and murder charges, the Defendant was indicted for the theft of the Featherstons' maroon Honda. However, the trial court severed the theft charge prior to trial. The court determined that the theft was not part of the same criminal transaction as the murder and aggravated robbery. It also prohibited

- 17 -

the State from eliciting evidence that the car had been stolen. However, the court permitted the State to show that the Defendant had control of the car before and after February 7, 1997, in order to establish that he was the perpetrator of the aggravated robbery and murder. It recognized that the Defendant's possession of the car before and after the victim's disappearance was "very material" to his identity as the perpetrator.

In the opening statement, the prosecutor said the following:

[F]rom February 8th through March 5th, [the Memphis Police Department] had been looking for [the Defendant] everywhere they could. They also knew that there was, obviously, some interest in this vehicle, maroon vehicle, and they ended up locating that - - a friend that had worked with [the Defendant] owned a vehicle matching that description. And learned that that vehicle had been taken from outside [the Featherstons'] home. And so the police are going to be on the lookout for this tag number and this vehicle.

At the conclusion of the statement, the Defendant objected to the State's use of the word "taken," moved to have the statement stricken, and argued that it was grounds for a mistrial. According to the Defendant, the State's words gave a "clear implication" that he had stolen the car, violating the court's order. The State argued that its statement did not violate the court's ruling because the car could have been borrowed or have been missing due to a misunderstanding.

The trial court determined that the State did not violate its order or necessitate a mistrial. The court found that the State had a right to show that the Defendant took the car and that the car was missing but not that any crime was committed when the car was taken. The court emphasized that the State would not be allowed to elicit testimony about whether the Defendant had permission to take the car or whether the police were called in response.

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intended to prove." *State v. Reid*, 164 S.W.3d 286, 343 (Tenn. 2005). Opening statements are not evidence. *State v. Thompson*, 43 S.W.3d 516, 523 (Tenn. Crim. App. 2000). Trial courts should allow the parties to present "a summary of the facts supportive of the respective theories of the case, only so long as those 'facts are deemed likely to be supported by admissible evidence.'" *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012) (quoting *Stanfield v. Neblett*, 339 S.W.3d 22, 41-42 (Tenn. Ct. App. 2010)). Therefore, opening statements should "be predicated on evidence introduced during the trial" and

should never refer "to facts and circumstances which are not admissible in evidence." *Sexton*, 368 S.W.3d at 415.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

The Defendant cites to a single authority to support his argument that the use of the word taken during the opening statement was improper. In *State v. James C. Greene, Jr.*, the defendant challenged his conviction on the basis that the State referred to inadmissible hearsay in its opening statement. No. 03C01-9407CR00247, 1995 WL 564939, at *1 (Tenn. Crim. App. Sept. 26, 1995). The trial court prohibited the State from introducing evidence that the police had conducted surveillance on the defendant based on information that he was involved in illegal activity. During the opening statement, the prosecutor said, "[T]he Third Judicial Drug Task Force had information that [the defendant was] dealing drugs." The defendant immediately objected to relevance and requested a mistrial. The court overruled the motion for a mistrial but sustained the objection and advised the jury to disregard the statement and not consider it for any purpose. *Id.* at *3.

On appeal, this court held that the defendant was not harmed by the prosecutor's statement and that a mistrial was not required. *Id.* at *4. The proof adduced at the trial showed that the defendant was an admitted drug abuser but was not a seller. The court concluded that the proof offered at the trial was not affected by the opening statement and that the jury acquitted the defendant of possession with intent to sell or deliver. *Id.*

*James C. Greene, Jr.* is distinguishable from the present case because in *James C. Greene, Jr.,* the prosecutor explicitly defied the trial court's order. However, in the present case, the trial court concluded that the State's comment did not run afoul of the pretrial order and reiterated that the State was allowed to show that the Defendant had possession of the car before and after the victim's disappearance to establish his identity as the perpetrator. The court attempted to balance the State's right to use the evidence to prove the perpetrator's identity and the Defendant's right to fairness by excluding evidence of the theft. We conclude that the court did not abuse its discretion in refusing to strike the opening statement or to grant a mistrial. The Defendant is not entitled to relief on this basis.

The Defendant also contends that the use of the word taken was a Fifth Amendment due process violation. He did not object on this basis at the trial, and the general contention is the extent of his argument on appeal. "In this jurisdiction, a party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection . . . in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634 (Tenn. Crim. App. 1994). When a party asserts new grounds in the appellate court, the issue is treated as waived. *Id.* at 635. Furthermore, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). The Defendant's failure to object on this basis at the trial or to adequately address the issue in his brief qualifies the issue for waiver. However, we will review this issue for plain error.

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642. A defendant carries the burden of proving that the trial court committed plain error. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The Defendant has not shown that the State's use of the word taken amounted to a violation of due process that adversely affected a substantial right. "For a 'substantial right' of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings." *State v. Maddin*, 192 S.W.3d 558, 562 (Tenn. Crim. App. 2005). The State's single use of the word taken in its opening statement comported with the trial court's previous ruling and with the evidence presented at trial. The Defendant is not entitled to relief on this issue.

### V. Evidence of Prior Assault on Victim and Escape Attempts

The Defendant contends that the trial court erred in admitting evidence related to his prior convictions for aggravated assault and rape of the victim. He asserts that the prior convictions are propensity evidence, the admission of which was prohibited by Tennessee Rule of Evidence 404(b). He also claims that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. He further contends that the court erred in admitting evidence of his escape attempts, including testimony that two "shanks" were found in his cell. The State responds that the court correctly admitted the evidence of the prior assault because it was highly probative to show motive, intent, and premeditation. The State argues that the court gave extensive jury instructions relative to the intended use of the evidence. Similarly, the State argues that the escape attempts were properly admitted to show consciousness of guilt.

The Defendant filed a pretrial motion pursuant to Tennessee Rule of Evidence 404(b) to exclude evidence of his prior convictions for the aggravated assault and rape and of his escape attempts. After a hearing, the trial court determined that the "extremely" high probative value of the prior convictions outweighed their prejudicial effect. In particular, the court found that the victim in the present case was also the victim of the aggravated assault and rape, which evidenced the Defendant's motive, intent, premeditation, and identity in the present case. Further, the court found that admission of the escape attempts was proper to show consciousness of guilt.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id.*; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is for an abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

The rationale behind the general rule of inadmissibility in Rule 404(b) is that the admission of evidence of other wrongs poses a substantial risk that the trier of fact may convict a defendant based upon the defendant's bad character or propensity to commit criminal offenses, rather than upon the strength of the evidence of guilt on the specific offense for which the defendant is on trial. *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008); *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002).

Evidence of other crimes, wrongs, or acts may be admitted as relevant to issues of "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *see Burch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980). To minimize the risk of unfair prejudice in the introduction of evidence of other acts, however, Rule 404(b) establishes protective procedures that must be followed before the evidence is admissible. *See* Tenn. R. Evid. 404(b); *James*, 81 S.W.3d at 758. Upon request, the trial court must hold a hearing outside the jury's presence to determine whether the evidence of the other acts is relevant to prove a material issue other than the character of the defendant. *James*, 81 S.W.3d at 758. The trial court must state on the record the specific issue to which the evidence is relevant and find the evidence of the other crime or act to be clear and convincing. *Id.* If the trial court substantially follows the procedures in Rule 404(b), the court's decision will be given great deference on appeal and will be reversed only if the trial court abused its discretion. *Id.* The Defendant acknowledges that the trial court followed the procedures required by Rule 404(b).

With respect to the prior convictions, the record reflects that the trial court carefully weighed the probative value against the danger of unfair prejudice. The relevant convictions were for violent offenses and involved the victim in the present case. The Defendant had been incarcerated for these crimes, and other evidence showed he made incriminating statements to a fellow inmate about his desire to kill the victim. The record supports the court's conclusion that the evidence had high probative value of showing motive, intent, premeditation, and identity, and the probative value of the evidence outweighed the danger of unfair prejudice. The court followed the prerequisites for admission under Rule 404(b), and we conclude that the court did not abuse its discretion in admitting this evidence.

- 22 -

Similarly, the record supports the trial court's admission of the evidence of the Defendant's prior escape attempts, including testimony that two shanks were found in his jail cell. "[E]vidence that an accused has escaped from custody, or attempted to escape from custody, after being charged with a criminal offense is admissible for the purpose of establishing the accused's guilt, consciousness of guilt, or knowledge of guilt." *State v. Burton*, 751 S.W.2d 440, 450 (Tenn. 1988). The evidence of the shanks corroborated details of the Defendant's escape plan that he intended to take a guard hostage and to kill a guard if necessary. The court instructed the jury that it was only to consider this evidence to determine the Defendant's consciousness of guilt. The court did not abuse its discretion in finding that the probative value of this evidence outweighed the danger of unfair prejudice. The Defendant is denied relief on this issue.

## VI. William Baldwin's Testimony

The Defendant asserts that the trial court erred in prohibiting William Baldwin from testifying about a statement made by an MPD detective. The Defendant argues that exclusion of this evidence violated Tennessee Rules of Evidence 401 and 402. He also asserts that the MPD lost a video recording made by Mr. Baldwin, which violated *Brady v. Maryland*, 373 U.S. 83 (1963). The State asserts that the court did not err because the proffered testimony was hearsay from an unknown police officer and was irrelevant. The State further responds that the *Brady* issue has been waived because it was not raised in the motion for new trial.

William Baldwin was an evidence technician for the Johnson County, Indiana Sheriff's Department. Before Mr. Baldwin testified at the trial, the Defendant sought permission to question Mr. Baldwin outside the presence of the jury regarding a statement he overheard when he processed the car. According to the Defendant, Mr. Baldwin overheard an MPD detective say, "Well, it looks like the n----r did it." The State opposed admission of the statement, arguing that Mr. Baldwin could not identify the person who allegedly made the statement and that it was inadmissible hearsay. The Defendant admitted that there was never an African-American suspect and that the evidence would not be offered to prove that an African-American committed the crime. However, he argued that the evidence was exculpatory. The Defendant surmised that if he could prove Detective Shemwell made the statement, the statement was relevant to Detective Shemwell's credibility. The trial court ruled that the evidence was irrelevant and inadmissible. The court further expressed skepticism that Mr. Baldwin heard what he thought he heard, noting that "Rimmer did it" sounded very similar and made more sense in context.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more

- 23 -

probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We conclude that the trial court did not abuse its discretion by determining that the proffered evidence was not relevant. The Defendant admitted there was never an African-American suspect. The Defendant is not entitled to relief on this basis.

The Defendant also argues that the exclusion of this evidence "violated the Fifth Amendment to the United States Constitution." This general contention is the extent of his argument. Although the Defendant raised the issue in his motion for a new trial, he did not contemporaneously object at the trial. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b); Tenn. R. Evid. 103(a), (b). In any event, we will review the issue for plain error.

"An evidentiary ruling ordinarily does not rise to the level of a constitutional violation." *State v. Powers*, 101 S.W. 3d 383, 397 (Tenn. 2003) (citing *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)). To determine whether the exclusion of evidence rises to the level of a constitutional violation, courts consider the following: (1) whether the evidence is critical to the defense, (2) whether it bears sufficient indicia of reliability, and (3) whether the interest supporting exclusion is substantially important. *State v. Brown*, 29 S.W. 3d 427, 433-34 (Tenn. 2000).

The excluded evidence in this case was not critical to the defense because the Defendant conceded that there was never an African-American suspect. A substantial right of the Defendant was not adversely affected. *See Smith*, 24 S.W.3d at 282. The Defendant is not entitled to relief on this issue.

Finally, the Defendant alleges that law enforcement's failure to preserve the videotape and to provide it to the defense violated *Brady*. The Defendant did not raise

this issue at the trial or include the issue in his motion for new trial and his appellate argument is limited to one sentence. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error.

Mr. Baldwin testified that he videotaped his inventory of the car and that the recording contained audio. The recording allegedly captured the statement, "[T]he n----r did it." Mr. Baldwin testified that he thought he provided the recording to the MPD but that he was not sure. Mr. Baldwin explained that the recording was not listed on the computer inventory list of all the items turned over to the MPD. He thought that he gave "everything" to the MPD and said that he had no reason to retain the recording. However, he had no record of providing it to MPD.

The defense argued that Mr. Baldwin's testimony supported its theory that the MPD intentionally destroyed the recording because the recording pointed to someone other than the Defendant as a suspect and that the MPD, and Detective Shemwell in particular, had "tunnel vision" in investigating the Defendant.

The trial court found that no evidence supported the Defendant's theory that Detective Shemwell intentionally destroyed the recording. The court noted that the detective had no reason to destroy the recording to cover up the possible identity of an African American suspect because there was no indication that an African-American suspect existed. The court concluded that the "whole thing is just an absolute nonissue." However, the court allowed the defense to ask Mr. Baldwin whether a videotape was made, whether he remembered giving it to MPD, and whether it was available at the time of trial.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

The Defendant has not shown that a clear and unequivocal rule of law was breached because the evidence does not show that the recording was material. A recording of one of the investigating detectives stating "the n----r did it" would not have cast doubt on the Defendant's identity as the perpetrator. Although the recording would have established that a detective engaged in unprofessional conduct, there is no reasonable probability that the jury would have acquitted the Defendant based upon the comment. The Defendant is not entitled to relief on this issue.

## VII. Drawing of the Honda Backseat

The Defendant alleges that the trial court erred when it allowed into evidence a drawing of the backseat of the car. According to the Defendant, the drawing did "not reflect the true condition of the backseat" and was admitted in violation of Tennessee Rule of Evidence 403. The State disagrees, claiming that the court's determination that the drawing would assist the jury was reasonable.

Tennessee Rule of Evidence 403 states that, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The decision to admit evidence will be reversed "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and the admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 249 (Tenn. 1999)).

TBI agent and forensic serologist Samera Zavaro testified that she processed the car for blood evidence. When she located a reddish-brown stain, she conducted a presumptive blood field test. If the surface was fabric and resulted in a positive presumptive test, she took cuttings of the stained area and later conducted tests of the cuttings to determine whether they contained human blood. If the stain was found on a hard surface, she swabbed the surface and performed a second test using the swab. She identified photographs of the car, including the backseat. She testified that because the interior fabric was also a reddish-brown color, it was difficult to discern stains from the photographs alone. However, she said that it was easier to see the stains when personally viewing the evidence. Accordingly, she made several drawings of the car in which she depicted the areas where stains were found, including the backseat.

When the State attempted to introduce the backseat drawing, the Defendant objected on the basis that the drawing was not the best evidence and was not accurate. He claimed that the drawing depicted more blood than the photographs. The trial court overruled the objection, pointing to Agent Zavaro's testimony that the stains were difficult to see in the photographs alone. The court found that the drawing would assist the jury's understanding and admitted the evidence. The court noted that the accuracy of the drawing could be challenged on cross-examination.

Although the Defendant does not elaborate in his brief about how admission of the evidence violated Rule of Evidence 403, his objection at the trial was based on the danger of misleading the jury. The trial court admitted the evidence based upon a finding that the drawing would assist the jury in understanding where in the backseat the blood was located. The Defendant did not ask Agent Zavaro questions challenging the accuracy of the drawing. The court did not abuse its discretion in admitting the evidence, and the Defendant is not entitled to relief on this basis.

The Defendant also asserts that admission of the backseat drawing violated the Fifth Amendment of the United States Constitution. He did not object on this basis at the trial and did not adequately address the issue in his appellate brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). As such, our review is limited to plain error.

An evidentiary ruling rarely rises to the level of a constitutional violation. *See Powers*, 101 S.W.3d at 397. Furthermore, we have already determined that admission of the backset drawing was proper under the Rules of Evidence. We conclude that the Defendant's allegation of constitutional error is without merit, and he has not established that admission was plain error. *See, e.g., State v. Dustin Dwayne Davis*, No. 03C01-9712-CR-00543, 1999 WL 135054, at *5 (Tenn. Crim. App. Mar. 15, 1999); *State v. Allan Brooks*, No. 01C01-9510-CC-00324, 1998 WL 754315, at *11 (Tenn. Crim. App. Oct. 29, 1998). He is not entitled to relief on this issue.

### VIII. Admission of James Allard's Previous Testimony

The Defendant contends that the trial court erred in finding James Allard was unavailable and in allowing the State to present Mr. Allard's testimony through a transcript of the previous trial. He asserts that the State's efforts to locate Mr. Allard were "wholly insufficient" and that the prior testimony should have been excluded. The State responds that its efforts to locate Mr. Allard were reasonable and that the court did not err in declaring Mr. Allard unavailable and in admitting his previous testimony.

TBI Agent Charles Baker testified that he attempted to locate Mr. Allard through law enforcement databases as well as Google searches. He consulted "CLEAR," which searched real estate records, criminal information, and both criminal and civil records. He also searched the State of Tennessee Justice Portal, which contained driver's license information, vehicle information, criminal histories, and Tennessee Department of Correction information. He further searched the National Crime Information Center (NCIC) which he characterized as a national search through the FBI. Finally, he searched death records. He found a potential phone number but, after calling the number, determined it was a "dead end."

On cross-examination, Agent Baker said that he did not attempt to contact Mr. Allard's family because he did not have information about any family members. Agent Baker admitted that he was not aware Mr. Allard had been previously incarcerated in Indiana and said that he did not search for him through the Indiana Department of Correction.

The Defendant argued that the State's efforts were insufficient. He asserted that Mr. Allard had a long criminal history and that if the right methods had been utilized, the State should have been able to identify his family members and gain more information about his whereabouts. The trial court found that the State's efforts were reasonable. The court stated that it did not "know how else [the State] can go about finding a witness, if they don't know who the family members are, other than Google searches and database searches." The court noted that Mr. Allard's imprisonment in Indiana nearly twenty years ago did not mean he was still in the state. The court found that the State was not required to send an investigator to every state in search of a witness.

The Constitution of the United States provides the accused in a criminal prosecution the right "to be confronted with witnesses." U.S. Const. amend. VI. The Tennessee Constitution similarly provides the right "to meet witnesses face to face." Tenn. Const. art. I, § 9. However, the right of confrontation is not absolute and must occasionally give way to considerations of public policy and necessities of the case. *State v. Kennedy*, 7 S.W.3d 58, 65 (Tenn. Crim. App. 1999) (citing *Jenkins v. State*, 627 N.E.2d 789, 793 (Ind. 1993)). Thus, the United States Supreme Court has refused to apply a literal interpretation of the Confrontation Clause which would bar the use of any hearsay. *Idaho v. Wright*, 497 U.S. 805, 814 (1990).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court announced the test to determine admissibility under the Confrontation Clause of hearsay offered against an accused. Testimonial statements may not be offered into evidence unless two requirements are satisfied: (1) the declarant/witness must be unavailable and (2) the defendant must have had a prior opportunity to cross-examine the

declarant/witness. *Id.* at 68. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

Mr. Allard's previous testimony was testimonial; thus, the pertinent consideration is whether the State proved that the witness was unavailable. To accomplish this, "the State must prove that it made a good faith effort to secure the presence of the witness in question." *State v. Sharp*, 327 S.W.3d 704, 712 (Tenn. Crim. App. 2010). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." *Crawford*, 541 U.S. at 74-75. Good faith refers to the extent to which the State must attempt to produce the witness and is a question of reasonableness. *Sharp*, 327 S.W.3d at 712 (citing *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)). The trial court's decision will be affirmed absent an abuse of discretion. *Hicks v. State*, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

Our supreme court considered what constitutes a good faith effort in *State v. Armes*, 607 S.W.2d 234 (Tenn. 1980). In *Armes*, the State attempted to subpoena the witness before trial and discovered that the witness had disappeared. *Id.* at 236. This disappearance resulted in a mistrial. *Id.* One week before the second trial and again one day before the second trial, the State attempted to subpoena the witness, but the State was unable to locate the witness. *Id.* At the trial the State attempted to present the witness's preliminary hearing testimony. *Id.* The State failed to provide any independent evidence of an attempt to locate the witness to prove the witness's unavailability other than a statement by the prosecutor. The supreme court held that "[t]he prosecuting attorney's statement to the Court concerning the efforts of the State's investigator to locate the witness cannot be considered as evidence of proof on the issue of the State's good faith effort." *Id.* at 237. Our supreme court also determined that the State was on notice that extra effort would be required to locate the witness because he did not appear for the first trial date. *Id.*

Unlike *Armes*, the State in the present case produced independent evidence of its efforts to locate Mr. Allard. Nearly twenty years had passed between the first trial and the State's attempts to locate Mr. Allard before the second trial. Agent Baker attempted to locate the witness using numerous search tools, including the NCIC database, which he explained was a national search through the FBI. Agent Baker developed one unsuccessful lead through a telephone number. The agent said he did not have information about Mr. Allard's family members and was unable to contact them to gain more information. This evidence supports the trial court's determination that the State made good-faith, although ultimately unsuccessful, efforts to locate the witness.

- 29 -

Given the passage of time and the independent evidence produced by the State, we conclude that the trial court did not abuse its discretion in determining Mr. Allard was unavailable.  The Defendant is not entitled to relief on this issue.

## IX.  Rhonda Ball Johnson's Testimony

The Defendant argues that the trial court erred in allowing Rhonda Ball Johnson to testify about conversations she had with William Conaley, alleging that it was inadmissible hearsay.  He asserts that her testimony violated Tennessee Rules of Evidence 801 and 802.  The State contends that the testimony was proper as prior consistent statements used to rehabilitate Mr. Conaley's credibility.

Mr. Conaley was incarcerated with the Defendant at Northwest Correctional Center in 1993.  He testified that the Defendant expressed his discontent that the victim had put him in prison.  The Defendant told Mr. Conaley that the victim's son, Chris Ellsworth, was going to receive money from a lawsuit and that the Defendant felt entitled to some of the money.

Mr. Conaley said that prior to his leaving on furlough, the Defendant asked him to relay a message to the victim.  The Defendant wanted the victim to know that he expected to receive some of the money from the lawsuit and that if he did not get it, he would kill her.  Mr. Conaley said that he relayed the threat to Ms. Johnson.  However, Mr. Conaley did not report the threat to the authorities, and he was released on parole shortly thereafter.

In January 1996, Mr. Conaley returned to custody.  In February 1997, Mr. Conaley read about the victim's disappearance in a newspaper and told family members about the Defendant's prior statements, but Mr. Conaley did not contact law enforcement.  However, he said that approximately one week later, an MPD officer visited him in prison.  He told the police about the Defendant's threatening the victim.

On cross-examination, Mr. Conaley admitted that when the Defendant made the statements in 1993, Mr. Conaley had already been granted parole and was awaiting release.  However, he admitted that when he spoke with law enforcement in 1997, the information might have gained him an earlier release.  Nevertheless, he denied contacting law enforcement, and he said that it was Ms. Johnson who told the police about the Defendant's threat after the victim disappeared. Mr. Conaley requested that he be transferred to the "annex" to finish his sentence, which he admitted was "easy time" in the prison system.  He said that after talking to the police about the Defendant, he was moved to the annex.

Ms. Johnson testified that she was the victim's niece. She was also childhood friends with Mr. Conaley. She confirmed that in 1993, Mr. Conaley told her about the Defendant's threat against the victim.

Generally, out-of-court statements offered to prove the truth of the matter asserted are inadmissible evidence. *See* Tenn. R. Evid. 801, 802. However, when a defendant attack's a witness's credibility, the State may rehabilitate the witness by offering evidence of a prior consistent statement. *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). Admission of prior consistent statements is authorized in two circumstances: (1) where the statement is offered to rebut the implication that the witness's testimony was a recent fabrication; and (2) when deliberate falsehood has been implied. *Id.* Prior consistent statements are not ordinarily admissible for the sole purpose of bolstering a witness's credibility. *State v. Braggs*, 604 S.W.2d 833, 885 (Tenn. Crim. App. 1980).

During Mr. Conaley's cross-examination, the defense implied that Mr. Conaley fabricated the Defendant's statement in 1997 because he faced years in prison and wanted to secure favorable treatment and early release. Thereafter, the State called Ms. Johnson, who testified that Mr. Conaley relayed the Defendant's threat to her in 1993, when Mr. Conaley had already been granted parole and had no motivation to lie in order to cut a deal with police. That testimony was properly admitted to rebut the Defendant's implication of recent fabrication, and this issue is without merit.

The Defendant also contends that admission of this evidence "was in violation of the Fifth Amendment of the United States Constitution." The Defendant did not object on this basis at the trial and did not elaborate in his appellate brief as to how admission violated his constitutional rights. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Accordingly, our review is limited to plain error.

Because we have already determined that admission of Ms. Johnson's statement was proper under the Rules of Evidence, we conclude that the evidence was not admitted in violation of the Defendant's constitutional rights and that the Defendant has not established plain error. He is not entitled to relief on this basis.

### X. Chris Ellsworth's Testimony

The Defendant asserts that allowing Chris Ellsworth, the victim's son, to show the jury his scars violated Tennessee Rules of Evidence 401, 402, and 403. The State responds that the court acted within its discretion to allow the evidence, which demonstrated the victim was unlikely to abandon her son, who had been badly burned, and rebutted the

defense's implication that the victim was not deceased. According to the State, the victim had provided extensive care to Mr. Ellsworth and would not have suddenly left.

At the trial, Mr. Ellsworth testified that he had been badly burned over 70% of his body in a water heater explosion and that he required extensive follow-up medical care. His mother was devoted to his care and frequently took him to LeBonheur Hospital as well as Shriners Hospital in Galveston, Texas, for treatment. She also worked with him daily on physical therapy for years after the accident. The State asked Mr. Ellsworth to show his scars to the jury. After the defense objected, the prosecutor explained that it wanted to show that the victim "was not the type of person that would have walked off without saying anything and leaving her children." The trial court agreed that the evidence was relevant, pointing out that the defense had said in its opening statement that the victim might not be deceased. The court agreed that the evidence did not have "a lot of probative value" under Rule 403 but that there was minimal danger of unfair prejudice. Thereafter, Mr. Ellsworth displayed the scars on his forearms to the jury.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The evidence was minimally relevant to support Mr. Ellsworth's testimony about the severity of his injuries and to combat the defense's argument that the victim might still be alive. The scars were a visual representation of the injuries described in the witness's testimony, and no evidence showed that the Defendant had any involvement in Mr. Ellsworth's injury. Despite the minimal relevance of the evidence, the Defendant has not articulated any prejudice he suffered based on the evidence's admission. The trial court found that the probative value was not substantially outweighed by the danger of unfair prejudice, and the record supports its determination. The court did not abuse its discretion in allowing the jury to view the scars.

The Defendant asserts, in a cursory fashion, that admission of this evidence "was clearly done in violation of the Fifth Amendment of the United States Constitution," an assertion that he did not raise at trial. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review this issue for plain error.

The Defendant has not established that admission of the evidence was prejudicial or improper. Likewise, we have considered his allegation of a constitutional error that

violated his due process rights and have determined that it is without merit. The Defendant is not entitled to relief on this basis.

## XI. Tim Helldorfer's Testimony Regarding William Conaley and James Allard

The Defendant alleges that the trial court erred in allowing Sergeant Tim Helldorfer to testify regarding statements made by Mr. Conaley and Mr. Allard, in violation of Rules of Evidence 801 and 802. The State contends that the testimony was prior consistent statements used to rebut implications on cross-examination about the Defendant's threat and confessions.

Sergeant Helldorfer testified that he interviewed Mr. Conaley in prison and that he obtained a statement from Mr. Allard in Johnson County, Indiana in 1997. Sergeant Helldorfer stated that Mr. Allard's previous testimony was consistent with the 1997 statement.

The Defendant objected, arguing that the statements were hearsay and were prior consistent statements. He contended that admitting the statements because a witness's credibility had been generally impeached was not the proper use of a prior consistent statement. The State asserted that the witness's credibility became an issue on cross-examination and that it was proper to show they had "previously made these statements" to different individuals. The Defendant argued that Mr. Conaley's 1997 statement was fabricated and that the State could not provide a statement he made to someone else as proof that it was not a fabrication.

The trial court stated that "the jury has a right to hear that [Mr. Allard and Mr. Conaley] gave consistent statements to . . . the police . . . ." It explained that the statements were being offered to bolster the witness's credibility. The court provided the following example to explain his ruling:

> If someone sees something, let's say they see someone run a light. And then they testify that they saw the person run the light.
>
> And the other side says, he didn't run the light, did he?
>
> Yes he did.
>
> And then [the witness] tells ten other people later on that he ran the light. I think the other side -- the first side has a right to put on the witnesses because he made that statement that he ran the light to many,

many people over and over. To show his credibility on the stand, the credibility of his testimony.

It's not being offered as substantive evidence. It's being offered to show his credibility, that he made that statement to several people.

The court allowed the officer to testify that Mr. Conaley's statements to police and at the trial were consistent. The court determined that the State could show Sergeant Helldorfer the transcript of Mr. Allard's trial testimony and ask whether it was consistent with Mr. Allard's statement to police. However, the contents of the transcript could not be admitted.

Out-of-court statements offered to prove the truth of the matter asserted are inadmissible at trial. *See* Tenn. R. Evid. 801, 802. However, when a defendant attacks a witness's credibility, the State may rehabilitate the witness by offering evidence of a prior consistent statement. *Benton*, 759 S.W.2d at 433. Admission of a prior consistent statement is authorized in two circumstances: (1) where the statement is offered to rebut the implication that the witness's testimony was a recent fabrication; and (2) when deliberate falsehood has been implied. *Id.* A prior consistent statement is not ordinarily admissible for the sole purpose of bolstering a witness's credibility. *Braggs*, 604 S.W.2d at 885.

Here, the trial court's comments reflect that the prior consistent statements were allowed merely to bolster the witness's credibility. The statements admitted through Sergeant Helldorfer were not made "before any improper influence or motive to lie existed." *State v. Herron*, 461 S.W.3d 890, 905 (Tenn. 2015) (citing *Sutton v. State*, 291 S.W. 1069, 1070 (Tenn. 1927)). The defense's cross-examination of these witnesses implied that the statements about the Defendant's threat were fabricated in an effort to gain favorable treatment from the State. The statements to the police were not made before the purported motive to fabricate existed. Therefore, they were not prior consistent statements, and the court erred in admitting the statements.

Recognizing that all errors are not equal, our supreme court has established three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *Powers*, 101 S.W.3d at 397; *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories dictate the standards to be applied when determining whether a particular error is harmless. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). A trial court's error in admitting evidence under the Tennessee Rules of Evidence falls into the category of non-constitutional error, and harmless error analysis under Tennessee Rule of Appellate Procedure 36(b) is appropriate. *See State v. Clark*,

452 S.W.3d 268, 287 (Tenn. 2014); *see also State v. James*, 81 S.W.3d 751, 763 (Tenn. 2002) (noting that "[h]armless error analysis applies to virtually all evidentiary errors other than judicial bias and denial of counsel"). Pursuant to Rule 36(b), the defendant bears the burden of showing that a non-constitutional error "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *Rodriguez*, 254 S.W.3d at 372.

The Defendant has not carried his burden in showing that he was prejudiced by admission of this evidence. Indeed, he has not offered any argument related to the prejudicial effect of this error. After considering the entirety of the evidence presented at the, we conclude that the error was harmless. The defense was able to cross-examine Mr. Conaley and Mr. Allard about their motivations to lie in exchange for more favorable treatment. The substance of the testimony was already in evidence, and the jury was instructed not to consider the consistent statements as substantive evidence. Further, overwhelming circumstantial evidence established the Defendant's guilt, including his previous relationship with the victim and motive for harming her, his threats to kill the victim, his confession to his cellmate, his possession of a car matching a description of the car seen at the motel, the presence in the car of blood and DNA matching the victim's, and his actions in the days following the victim's disappearance. Accordingly, the error was harmless, and the Defendant is not entitled to relief on this basis.

The Defendant also maintains that admission of this evidence violated the Fifth Amendment of the United States Constitution. He did not object on this basis at the trial and does not elaborate in his appellate brief as to how the Fifth Amendment was violated. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error, and we conclude that the Defendant has not shown that the admission of this evidence affected a substantial right. The substantial right inquiry under the plain error doctrine mirrors the harmless error analysis under Rule 36(b). *See Maddin*, 192 S.W.3d at 562. Upon consideration, we conclude, as well, that admission of the evidence did not violate the Defendant's due process rights under the Fifth Amendment.

### XII. Trial Court's Limitation of Sergeant Helldorfer's Testimony

The Defendant contends that the trial court erred in limiting the defense's questioning of Sergeant Helldorfer. He argues that the defense should have been allowed to ask during cross-examination whether Billy Wayne Voyles had been positively identified. The Defendant further asserts that Sergeant Helldorfer should have been allowed to testify about a document relating to the release of the maroon Honda. The State responds that the defense agreed to the limitation on testimony about the positive identification and cannot now claim error. Further, the State asserts that the document was inadmissible because it could not be authenticated by the witness.

- 35 -

## A. Positive Identification

During its examination of Sergeant Helldorfer, the defense asked whether he was "aware that there was a positive identification made, that Billy Voyles was positively identified in the case." The prosecution objected to the question, arguing it was hearsay. The court overruled the objection because it was admissible as a prior identification but stated that there was a question as to whether a witness made a "positive" identification. Defense counsel then said, "I will take the word positive out if that is the problem." The court additionally noted that the Defendant needed to establish that the questioning was related to Mr. Darnell's identification of Mr. Voyles. The defense again agreed and asked Sergeant Helldorfer whether "Mr. Darnell had identified Billy Wayne Voyles as an eye witness as being on the scene at the time during [the] investigation." Sergeant Helldorfer answered affirmatively.

Tennessee Rule of Appellate Procedure 36(a) provides that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The Defendant agreed to take the word positive out of the question posed to Sergeant Helldorfer, and he cannot now claim error on that basis. In any event, the Defendant has not explained how he was prejudiced by this limitation. Sergeant Helldorfer testified that Mr. Darnell identified Mr. Voyles as one of the men he saw in the motel office, and Mr. Darnell testified that he identified Mr. Voyles. The Defendant is not entitled to relief on this basis.

The Defendant also alleges that this limitation violated his Fifth Amendment rights under the United States Constitution. The Defendant did not raise this issue at the trial and does not provide any meaningful argument regarding this issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review the issue for plain error and conclude that the Defendant has not proven this limitation amounted to a due process violation or that a substantial right was adversely affected. The defense sought to elicit testimony that Mr. Darnell identified Mr. Voyles as one of the men at the motel. The court did not allow the defense to use the word "positive" when pursuing this line of questioning because Mr. Darnell had not used the word when he testified about the identification. The Defendant agreed to remove the word "positive" from his question. Deleting the word from the question did not meaningfully change the witness's testimony and had no effect on the outcome of the trial. The Defendant is not entitled to relief on this basis.

**B. Towing Slip**

During cross-examination, the defense showed Sergeant Helldorfer three documents, one of which was a towing slip for the Honda. When asked whether he recognized them, he replied that he only recognized the towing slip. The Defendant questioned Sergeant Helldorfer about the two unidentified documents. The State objected, arguing that the witness had not authenticated the documents. In response, the defense asserted that the three documents were received together in discovery and that Sergeant Helldorfer's signature appeared on the towing slip. The defense asserted that one of the unidentified documents appeared to be the back of the towing slip, which had been authenticated by Sergeant Helldorfer. The defense explained that it was attempting to establish when the car was released and to whom, information that was reflected on one of the documents. However, Sergeant Helldorfer testified that the writing on the purported back of the towing slip was not his. He explained that he only wrote on the front of the towing slip and could not verify the information contained on the back. The trial court informed the Defendant that the witness had to authenticate the document purported to be the back of the towing slip before it could be admitted into evidence. Thereafter, the officer testified that his signature was on the towing slip, which reflected that the car was released on March 25. However, he did not have personal knowledge of where the car was taken after it was released. Because he could not identify the purported back of the towing slip, that document was not admitted into evidence.

Before a document is admitted into evidence, the party seeking admission generally must authenticate the document. *State v. Troutman*, 327 S.W.3d 717, 722 (Tenn. Crim. App. 2008); *See* Tenn. R. Evid. 901(a). Sergeant Helldorfer testified that he recognized the towing slip. However, he was unable to identify the document that the defense claimed was the back of the towing slip. The trial court did not abuse its discretion in refusing to admit the unauthenticated document, and this issue is without merit.

The Defendant again asserts a Fifth Amendment challenge to this issue, which was not a basis for objection at trial and is not adequately argued in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review the issue for plain error and conclude that the Defendant has not established that the trial court's decision violated a clear and unequivocal rule of law. Because there was no error in the court's decision to exclude this evidence based on a lack of authentication, the allegation of a constitutional error is without merit. The Defendant is not entitled to relief on this basis.

## XII.  Joyce Carmichael's Testimony

Joyce Carmichael is the official records officer for the Tennessee Department of Correction.  Ms. Carmichael testified that Tommy Voyles and the Defendant were both incarcerated at Lake County Regional Correctional Facility during a five-month period in 1992.  Later in the trial, another witness testified that Tommy and Billy Voyles were related and that the witness had seen them together, although the witness did not specify how they were related.  Before her testimony, the defense objected to the relevance of evidence that Tommy Voyles had been incarcerated with the Defendant previously. The prosecutor argued that there was more than one person involved in the victim's disappearance and that Tommy Voyles might have been involved.  Thus, the State wanted to show the connection between the Defendant and Tommy Voyles.  The defense pointed out that the only testimony regarding Tommy Voyles was that he had been previously married to the victim.  The State further explained that "there appear to be multiple people involved in this" and that one of the individuals involved was identified by a witness as Billy Voyles.  Thus, argued the State, "the fact that [the Defendant] has a close connection with a Tommy Voyles would be relevant."  The trial court admitted the testimony, noting that it was "not extremely probative but there's absolutely no unfair prejudice."

The evidence does not support the trial court's determination that evidence attempting to connect the Defendant with Tommy Voyles was relevant.    The evidence was too remote to be relevant to a material issue in the case.  Tenn. R. Evid. 401 and 402.  There was testimony that Tommy Voyles and the Defendant had been incarcerated in the same facility but not that they knew each other, were housed together, or interacted in any capacity during that time.  Even if a "close connection" between the Tommy Voyles and the Defendant were proved, that connection does not result in a conclusion that a connection existed between the Defendant and Billy Voyles.  The court's admission of this irrelevant evidence was error, but we conclude that the error was harmless based upon the overwhelming circumstantial evidence of the Defendant's guilt.  *See* Tenn. R. App. P. 36(b).  The Defendant is not entitled to relief on this basis.

## XIV. Prior Testimony of Unavailable Witnesses

The Defendant contends that the trial court erred in allowing previous testimony from witnesses, along with related exhibits, who were unavailable at the second trial.  He alleges that the admission of this testimony was unfair because the witnesses were questioned by his previous counsel, who were found to be constitutionally ineffective.  The State responds that each of the unavailable witnesses was subject to cross-examination and that counsel from the Defendant's first trial were not ineffective in questioning witnesses.

Pursuant to Tennessee Rule of Evidence 804(b), the former testimony of a declarant who is currently unavailable to testify is admissible.  "Former testimony" is "[t]estimony given as a witness at another hearing of the same or a different proceeding . . ., if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination."  Tenn. R. Evid. 804(b)(1).  The similar motive requirement is met when the issues in the present case are "sufficiently similar" to the issues in the case in which the prior testimony was given.  *See State v. Howell*, 868 S.W.2d 238, 252 (Tenn. 1993).  The Constitution of the United States provides the accused in a criminal prosecution the right "to be confronted with witnesses."  U.S. Const. amend. VI.; *see also* Tenn. Const. art. I, § 9.  However, "the Confrontation Clause only guarantees 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).  Our courts have upheld the admission of prior testimony given at a preliminary hearing, *see State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009), and in another state, *see Howell*, 868 S.W.2d at 252.

The prior testimony of eight witnesses was read into evidence at the Defendant's trial.  With the exception of one witness, the prior testimony was from either the Defendant's preliminary hearing or his first trial.  The exception was the testimony of Dixie Presley, who testified at the previous trial and at the Defendant's post-conviction evidentiary hearing.  The post-conviction court determined that trial counsel were ineffective for failing to cross-examine Ms. Presley about the two men she saw at the motel on the night of the victim's disappearance.  However, she was specifically questioned about this matter at the post-conviction hearing, and this testimony was read into evidence at the Defendant's second trial.  Therefore, any failure to effectively cross-examine Ms. Presley at the first trial was satisfied by her questioning at the post-conviction hearing and the subsequent introduction of this evidence at the second trial.

The record reflects that the Defendant had an opportunity to, and in fact did, cross-examine each witness.  The Defendant had a similar motive to develop the testimony of these witnesses during examination in the prior proceedings in which he was facing the same charges.  Other than the exception discussed above, the Defendant was granted post-conviction relief on the basis that his counsel were ineffective in investigating the case, not in examining witnesses.  The Defendant has not cited any cases holding that prior testimony is inadmissible when post-conviction relief is granted for a reason unrelated to counsel's examination of witnesses.  Accordingly, he is not entitled to relief on this basis.

- 39 -

The Defendant also argues that admission of this prior testimony violated his Fifth Amendment rights. He did not object on this basis at trial and does not elaborate on this issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review the issue for plain error.

Because we have determined that admission of the prior testimony was proper, we conclude that the Defendant has not shown that his due process rights were violated in this respect. No clear and unequivocal rule of law was breached, and the Defendant is not entitled to relief on this basis.

## XV. Admission of Richard Rimmer's Prior Inconsistent Statements

The Defendant alleges that the trial court should not have admitted Richard Rimmer's prior inconsistent statements and related exhibits as substantive evidence. The State asserts that this evidence was properly admitted as a prior inconsistent statement and as past recollection recorded.

At trial the Defendant's brother, Richard Rimmer, testified that he could not recall giving a statement to the police in 1997. The State showed Mr. Rimmer a copy of a statement dated February 18, 1997, and although he recognized his signature on the statement, he did not remember giving the statement. The prosecutor asked Mr. Rimmer about each question and answer provided in the statement. In two instances, he denied providing a particular answer, but he mostly stated that he had no memory of the statement. He testified that he had suffered several head injuries, which impacted his memory. The State also showed him drawings he allegedly made, but he denied making the drawings.

The State sought to have the statement and drawings admitted as substantive evidence under Tennessee Rule of Evidence 803(26). The trial court found that for the statements Mr. Rimmer denied making, they were prior inconsistent statements under Tennessee Rule of Evidence 613(b) and were admissible, if the court found they were trustworthy, pursuant to Rule 803(26), providing a hearsay exception for prior inconsistent statements. For the statements Mr. Rimmer did not remember making, the court found that he was an unavailable witness pursuant to Rule of Evidence 804(a)(3), and those questions and answers could be read to the jury. Both sides presented testimony relevant to competency at the time the statement was given.

The defense called Mr. Rimmer's mother, Sandra Rimmer, who testified that Mr. Rimmer had received disability benefits since 1990 or 1991 due to a head injury that caused brain damage. She stated that his daily activities were impacted and that he "sometimes . . . thinks things are happening [that were] not happening." Ms. Rimmer

admitted that in 1997, Mr. Rimmer was capable of living on his own, managed daily activities without assistance, and worked to support himself. She also said he was competent to enter into a lease agreement.

The State called Sergeant Helldorfer, who testified that he met with Mr. Rimmer on February 13 and 18, 1997. His impression was that Mr. Rimmer fully understood the questions asked and answered them appropriately. Sergeant Helldorfer said that he did not ask leading questions and that Mr. Rimmer provided the details. The February 18 conversation was memorialized in a written statement. The officer also testified about Mr. Rimmer's drawings. One drawing depicted the location of the blood in the backseat, and the other was a drawing of the shovel, of which the Defendant asked Mr. Rimmer to dispose. Sergeant Helldorfer confirmed that the statement and drawings about which Mr. Rimmer had been questioned were those obtained by Sergeant Helldorfer on February 18, 1997.

In assessing whether the evidence was trustworthy, the trial court noted the level of detail contained in Mr. Rimmer's answers. The court further found that the statement appeared to come from a competent person and not from someone who was intellectually disabled. The court determined that the statement was given under circumstances indicating its trustworthiness.

The trial court determined that the statements Mr. Rimmer denied making were admissible pursuant to Rule 803(26). The court further ruled that the drawings could be admitted into evidence, as Mr. Rimmer had denied making them. However, as to the statements for which Mr. Rimmer claimed a lack of memory, the court found those were not inconsistent statements and could not be admitted under 803(26). Rather, the court found that portions of the statement qualified as a past recollection recorded pursuant to Rule 803(5). Thus, those portions could be read into evidence but not admitted as an exhibit.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. However, many exceptions to the rule against hearsay exist. Tennessee Rule of Evidence 803(26) provides that a prior inconsistent statement that is otherwise admissible under Rule 613(b) is admissible as substantive evidence if the following prerequisites are met:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

This rule has been interpreted to apply when a testifying witness claims a lack of memory. *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015).

Tennessee Rule of Evidence 613(b) permits the use of extrinsic evidence of prior inconsistent statements for the purpose of impeachment. The Rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

Additionally, Rule 803(5) provides another exception to the hearsay rule, which is commonly referred to as past recollection recorded. That rule deems admissible

[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The Defendant alleges that Mr. Rimmer's prior statement should have been considered by the jury for impeachment purposes only. However, Rule 803(26) provides that an inconsistent statement may be admitted as substantive evidence when certain conditions are satisfied. Mr. Rimmer testified at the trial that the statement was written and signed by him, and the trial court conducted a jury-out hearing during which it determined the statement was trustworthy. The court did not err by admitting the prior statement pursuant to Rules 613(b) and 803(26). Additionally, the statement was properly admitted as a recorded recollection under Rule 803(5). The statement was taken shortly after the events in question, and Mr. Rimmer no longer remembered the statement. Further, the court allowed the statement to be read into evidence but did not admit it as an exhibit. Accordingly, Mr. Rimmer's prior statement was admissible under 803(26) and 803(5), and the Defendant is not entitled to relief on this issue.

The Defendant again asserts a general Fifth Amendment challenge to the admission of this evidence, although he did not object on that basis at trial and does not provide meaningful argument on the issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error. In that regard, we conclude that the Defendant has not established that he is entitled to plain error relief.

## XVI. Kenneth Falk's Testimony

The Defendant argues that the trial court erred in prohibiting the testimony of attorney Kenneth Falk regarding the success of a lawsuit concerning conditions at the Johnson County Jail in Indiana. The State responds that the evidence was properly excluded as it was irrelevant.

The Defendant offered the testimony of Mr. Falk to establish that the Defendant's escape attempts were related to the conditions at the jail and did not reflect a consciousness of guilt. The State objected on relevancy grounds. The trial court allowed the testimony to rebut the implication that his escapes were based on guilt. However, the court prohibited Mr. Falk from testifying about any details the Defendant discussed with him.

Mr. Falk testified that was legal director of the American Civil Liberties Union (ACLU) of Indianapolis, Indiana. He said that in 1997, the Defendant contacted his office concerning the conditions at the Johnson County Jail. His office filed a lawsuit based on the Defendant's complaints, although it was filed on behalf of other inmates because the Defendant was no longer confined in the jail by the time the lawsuit was filed. When the defense asked Mr. Falk whether the lawsuit was successful, the State objected. The trial court sustained the objection, stating there was no need "to talk about what happened in the lawsuit."

The trial court did not abuse its discretion in limiting Mr. Falk's testimony. The defense's stated purpose in offering the evidence was to provide a reason, other than guilt, for the Defendant's escape attempts. Mr. Falk established that the Defendant complained about the conditions and that a lawsuit was filed as a result. The court did not abuse its discretion in limiting the details of the lawsuit, including whether it was successful. The Defendant is not entitled to relief on this basis.

The Defendant maintains that excluding this evidence violated the Fifth Amendment of the United States Constitution. He did not object on this basis at trial and does not elaborate on the issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Thus, our review is limited to plain error.

- 43 -

To determine whether the exclusion of this testimony to the level of a constitutional violation, we consider the following: (1) whether the evidence is critical to the defense, (2) whether it bears sufficient indicia of reliability, and (3) whether the interest supporting exclusion is substantially important. *See Brown*, 29 S.W. 3d at 433-34.

The Defendant has not proven that the evidence was critical to his defense, and therefore, no substantial right was adversely affected. As noted above, the Defendant was able to establish through Mr. Falk's testimony that conditions at the jail led the ACLU to file a lawsuit, which provided an alternative reason for the Defendant's escape attempt. We cannot conclude that additional testimony that the lawsuit was successful would have changed the outcome of the trial. Accordingly, plain error relief is not warranted.

## XVII. Marilyn Miller's Testimony

The Defendant asserts that the trial court erred in not allowing Marilyn Miller to give an opinion on the length of time that the maroon Honda should have been kept by law enforcement. He alleges that her testimony would have supported his request for a *Ferguson* jury instruction. He claims that exclusion of this testimony violated Rules of Evidence 401 and 402. The State contends that the exclusion was proper and argues that the decision to provide a *Ferguson* instruction was a question of law for the court and that Dr. Miller's testimony would not have assisted the jury. The State further responds that the proffered testimony was outside the scope of Dr. Miller's expertise.

Dr. Miller testified that she was an associate professor of forensic science at Virginia Commonwealth University. She had a bachelor's degree in chemistry, a master's degree in forensic chemistry, and a doctorate in education. Before teaching, she spent fourteen years working as a forensic scientist and a crime scene investigator for three law enforcement agencies. Her duties included responding to and investigating crime scenes and analyzing evidence in a laboratory. She had taught for twenty-two years in the field of forensic science and crime scene investigation. The trial court admitted Dr. Miller as an expert in crime scene investigation, crime scene reconstruction, forensic science, and serology and blood spatter analysis.

The defense asked Dr. Miller whether she had an opinion regarding the length of time the maroon Honda should have been retained by law enforcement. The State objected, and the trial court sustained the objection. The court acknowledged that Dr. Miller was a crime scene expert but found that it was improper for her to give an opinion about the duty to preserve evidence as it related to *Ferguson*.

The Defendant asserts that this limitation violated Rules of Evidence 401 and 402. As previously discussed, Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 provides, in part, that "[e]vidence which is not relevant is not admissible."

The Defendant contends that Dr. Miller's testimony would have assisted the jury in understanding "that the defense was not given ample opportunity to inspect and test the maroon Honda." However, we agree with the State that this matter was relevant to whether there was a duty to preserve, and that was an issue solely within the purview of the trial court. Accordingly, the court did not abuse its discretion in ruling the testimony was inadmissible.

The Defendant contends that exclusion of this evidence violated the Fifth Amendment. Because he did not raise this issue at trial and does not provide argument regarding this issue in his appellate brief, our review is limited to plain error. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We conclude that the Defendant failed to meet his burden in proving that exclusion of Dr. Miller's testimony violated a clear and unequivocal rule of law. The evidence was not critical to the defense because the issue of the duty to preserve evidence is a matter of law for the trial court's determination. Dr. Miller's testimony would not have assisted the jury in its resolution of any issue in the case. The Defendant is not entitled to relief on this basis.

### XVIII. Documents Related to Lawsuit against Shelby County Jail

Next, the Defendant asserts that the trial court should have admitted into evidence another prisoner's affidavit about the prisoner's experiences in the Shelby County Jail and about a 2000 contempt order. The State disagrees, arguing that these documents lacked probative value because they related to the jail's conditions when the Defendant was no longer confined there and that the affidavit was inadmissible hearsay.

Attorney Robert Hutton testified that in 1996 or 1997 he filed a lawsuit against the Shelby County Jail, alleging that jail conditions violated the Eighth Amendment to the United States Constitution. Shelby County stipulated that the conditions were unconstitutional and agreed to make changes to the facility. The defense attempted to admit several documents related to the lawsuit, and the State objected. One of the documents was described as a contempt order, which contained "graphic, specific instances, everything from smack down tournaments . . . to gang rapes." The State argued that no evidence reflected that the Defendant had personal knowledge of these

activities and that it was irrelevant to show why he attempted to escape. The State also noted that several of the documents pertained to times when the Defendant was no longer confined at the jail. The defense argued that the documents described the jail as a "hell hole" and that the documents were relevant to establishing the Defendant's state of mind at the time of the attempted escape.

The trial court found that the general information relating to the conditions at the jail and the county's admission that they were unconstitutional were admissible. It excluded evidence of specific instances of conduct at the jail, unless the Defendant could establish a link between himself and the conduct. The court stated that the Defendant had "a right to show that the jail conditions were bad, as a possible reason that he might escape, but as far as showing that some gang member raped some other gang member in the jail, . . . that is far [afield]." Thus, the court permitted the defense to present the consent order in which Shelby County admitted the conditions were unconstitutional but not the additional litigation documents because "the majority of which took place when [the Defendant] was not in [the] jail."

The purpose of the evidence was to provide a reason for the Defendant's attempted escape other than a consciousness of guilt. Mr. Hutton's testimony and the consent order established that conditions at the jail were unconstitutional and that the County agreed to make changes. The excluded documents generally detailed specific instances of violence and sexual assault, but the incidents were not connected to the Defendant, and he did not establish the excluded documents relevance. Therefore, the trial court did not abuse its discretion by prohibiting the admission of the relevant documents, and the Defendant is not entitled to relief on this basis.

The Defendant asserts that the exclusion of this evidence was a violation of the Fifth Amendment of the United States Constitution. He did not assert that issue at trial, and his cursory treatment of the issue in his brief qualifies it for waiver. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error. We conclude that the specific instances of conduct the Defendant sought to introduce were not critical to the defense because nothing connected the Defendant's experience at the jail to the unconstitutional conduct. Accordingly, the trial court's exclusion did not affect the outcome of the trial. The Defendant has not established plain error and is not entitled to relief on this basis.

## XIV. Non-Capital Sentencing

Finally, the Defendant raises one sentencing issue related to the application of an aggravating factor relative to his aggravated robbery conviction. He asserts that proof did not support a finding that he was a leader in the offense and that the trial court erred by applying this factor and ordering the sentence for aggravated robbery to be served consecutively to the death sentence. The State responds that the Defendant has waived this issue for failing to include a transcript from this portion of the sentencing phase. Alternatively, the State asserts that the evidence supported application of the enhancing factor.

As the appellant, it was the Defendant's burden to prepare an adequate record for appellate review. *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). In the absence of an adequate record, this court must presume that the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993); *see also State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993) (holding that when the appellant contends that the sentence is excessive but does not include a transcript from the sentencing hearing, the issue of excessive sentences will be considered waived); Tenn. R. App. P. 24(b).

Without a transcript of the non-capital sentencing hearing, this court cannot evaluate the trial court's application of the enhancement factor, and we presume the court's action was correct. The Defendant is not entitled to relief on this basis.

## XV. Mandatory Review

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tennessee Code Annotated section 39-13-206(c)(1)(2018) requires this court to review the record to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## A. Arbitrariness of Death Sentence

In accordance with the trial court's instructions, the jury unanimously determined that the State proved beyond a reasonable doubt that an aggravating circumstance applied to the murder committed by the Defendant and that the aggravating circumstance outweighed the mitigating circumstances. The record reveals that the penalty phase was conducted pursuant to the applicable statutory provisions and to the rules of criminal procedure. We conclude that the Defendant's sentence of death was not imposed in an arbitrary fashion.

## B. Evidence Supporting Aggravating Circumstances

We next turn to the sufficiency of the evidence supporting the aggravating circumstances found by the jury. In considering whether the evidence supports the jury's findings of statutory aggravating circumstances, we must determine, after viewing the evidence in the light most favorable to the State, whether a rational trier of fact could have found the existence beyond a reasonable doubt of the aggravating circumstances. *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006) (citing *Reid*, 164 S.W.3d at 314).

The jury applied one aggravating circumstance that the Defendant "was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." T.C.A. § 39-13-204(i)(2)(Supp. 1998). Our supreme court has defined the word "violence" as "physical force unlawfully exercised so as to injure, damage or abuse." *State v. Fitz*, 19 S.W.3d 213, 217 (Tenn. 2000). "When the statutory elements of the prior felony . . . , in and of themselves, do not necessarily involve the use of violence to the person," the trial court is required to examine the facts underlying the felony to determine whether the (i)(2) aggravating circumstance may properly be considered by the jury. *State v. Bell*, 512 S.W.3d 167, 204 (Tenn. 2015) (citing *State v. Sims*, 45 S.W.3d 1, 11-12 (Tenn. 2001)).

In support of the (i)(2) aggravating circumstance, the State relied upon four prior convictions: assault with the intent to commit robbery with a deadly weapon, rape, and two counts of aggravated assault. The trial court noted that aggravated assault could be accomplished with or without violence and, accordingly, would not always qualify as an aggravator under subsection (i)(2). The court reviewed the aggravated assault indictments and determined that the underlying facts involved the use of violence. *See State v. Young*, 196 S.W.3d 85, 111-12 (Tenn. 2006) (setting forth guidelines for determining whether a prior felony involves the use of violence against a person). Therefore, the court allowed the State to present these prior convictions to the jury for review. To establish the prior convictions, the State introduced judgments for each

conviction. We conclude that the evidence is sufficient to support the jury's application of the (i)(2) aggravating factor.

## C. Weighing Aggravating and Mitigating Circumstances

We next consider whether the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. We must determine "whether a rational trier of fact could find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt when the evidence is taken in the light most favorable to the State." *State v. Freeland*, 451 S.W.3d 791, 820 (Tenn. 2014).

At the sentencing hearing, the Defendant stated that he did not wish to present any mitigating evidence. The trial court noted that the Defendant would need to be questioned on the record about his decision to forego the presentation of mitigating evidence pursuant to *Zagorski v. State*, 983 S.W.2d 654, 660-61 (Tenn. 1998). The Defendant was placed under oath and testified unequivocally that he understood the importance of mitigating evidence and his right to present such evidence, that he had sufficiently discussed the matter with his attorneys, who strongly advised against his decision, and that he wished to forego presentation of the evidence. The court determined that the Defendant had freely and voluntarily waived his right to present mitigation evidence. The court stated that the Defendant had already been through two capital sentencing trials, one at which mitigation evidence was presented, and that the Defendant likely understood the consequences of his decision. In accordance with the Defendant's decision, the defense did not present mitigating evidence, although the court instructed the jury that it could consider any mitigating evidence raised by the evidence and produced by the prosecution or defense in the guilt and sentencing phases.

The record contained little, if any, evidence that could mitigate the Defendant's actions, and the State presented sufficient evidence of the Defendant's prior felonies as an aggravating factor. We therefore conclude that, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the (i)(2) aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt.

## D. Proportionality Review

When this court conducts the proportionality review required by Tennessee Code Annotated section 39-13-206(c)(1)(D), we do not function as a "super jury" that substitutes our judgment for the judgment of the sentencing jury. *See State v. Godsey*, 60 S.W.3d 759, 782 (Tenn. 2001). Rather, we must take a broader perspective than the jurors to determine whether the defendant's sentences are "'disproportionate to the

sentences imposed for similar crimes and similar defendants.'" *State v. Thacker*, 164 S.W.3d 208, 232 (Tenn. 2005) (quoting *Bland*, 958 S.W.2d at 664). The pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006).

The purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the case being analyzed. *State v. Copeland*, 226 S.W.3d 287, 306 (Tenn. 2007). Rather, our task is to "identify and invalidate the aberrant death sentence." *Thacker*, 164 S.W.3d at 233. A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *State v. Carruthers*, 35 S.W.3d 516, 569 (Tenn. 2000). Rather, a death sentence is excessive or disproportionate where '"the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed."' *Thacker*, 164 S.W.3d at 233 (quoting *Bland*, 958 S.W.2d at 668).

This court uses '"the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes."' *Copeland*, 226 S.W.3d at 305 (quoting *State v. Davis*, 141 S.W.3d 600, 619-20 (Tenn. 2004)). We examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002).

In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*Rimmer*, 250 S.W.3d at; *see Rollins*, 188 S.W.3d at 575. We also compare the defendant's "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Rimmer*, 250 S.W.3d at 35; *see Rollins*, 188 S.W.3d at 575.

The evidence in the present case established that the victim was the Defendant's former girlfriend and that he had raped and assaulted her on a previous occasion. He blamed the victim for sending him to jail and threatened to kill her, suggesting premeditated murder motivated by revenge. Although her body has not been recovered, the evidence at the crime scene, including the amount of blood, suggested that the victim suffered a violent death. The evidence also established that the murder occurred during the perpetration of a robbery. The Defendant disposed of the victim's body. At the sentencing hearing, the victim's mother testified that not knowing exactly how the victim died and not being able to provide a proper burial was immensely hurtful to the victim's family.

The Defendant was thirty-one years old at the time of the instant offenses, and he had prior convictions for assault with intent to commit robbery with a deadly weapon, rape, and two counts of aggravated assault. He provided no assistance to the police during the investigation and expressed no remorse for his crimes.

We conclude that the death sentence in this case is not excessive nor disproportionate when compared to the death penalty imposed in similar cases. *See State v. Ivy*, 188 S.W.3d 132 (Tenn. 2006) (defendant shot his estranged girlfriend multiple times; prior violent felony aggravator applied); *State v. Faulkner*, 154 S.W.3d 48, 63 (Tenn. 2005) (defendant murdered his estranged wife after repeated threats to kill her); *State v. Keough,* 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed wife after an argument in a bar and left her to bleed to death in a car; prior violent felony aggravator applied); *State v. Chalmers*, 28 S.W.3d 913 (Tenn. 2000) (sole aggravating factor was prior violent felony); *State v. Suttles*, 30 S.W.3d 252, 255 (Tenn. 2000) (defendant murdered his estranged girlfriend); *State v. Hall*, 8 S.W.3d 593 (Tenn. 1999) (defendant murdered his estranged wife); *State v. Smith*, 993 S.W.2d 6 (Tenn. 1999) (defendant murdered store owner in course of a robbery and prior violent felony aggravator applied); *State v. Johnson*, 743 S.W.2d 154 (Tenn. 1987) (defendant killed his estranged wife by suffocation and prior violent felony aggravator applied).

In completing our review, we need not conclude that this case is identical to prior cases in every respect, nor must this court determine that this case is "more or less" like other death penalty cases. *See Thomas*, 158 S.W.3d at 383. Rather, this court need only identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. The penalty imposed by the jury in the present case is not disproportionate to the penalty imposed for similar crimes.

CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE